RECEIVED
NOV 09 1987
U.S. DIST. COU'
T. PAUL, MN.

MAY 27   5 33 PM '87
RECEIVED
U. S. MARSHAL
MPLS. MINN.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD   DIVISION
Criminal No. #87-0551 FEB

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,        )
                                )
        v.                      )          WRIT OF HABEAS CORPUS
                                )          AD PROSEQUENDUM
TERRY JON MARTIN                )
                                )
              Defendant.        )

TO:  SHERIFF, HENNEPIN COUNTY JAIL, MINNEAPOLIS, MINNESOTA
     OR ANY OTHER PERSON HAVING CUSTODY OF THE ABOVE-NAMED
     DEFENDANT, THE UNITED STATES MARSHAL FOR THE DISTRICT
     OF MINNESOTA, AND ANY UNITED STATES MARSHAL OF ANY
     DISTRICT WHEREIN THE ABOVE-NAMED DEFENDANT MAY BE IN
     CUSTODY.

     We command that you have the body of   Terry Jon Martin

_____, the defendant above named, now

detained in  Hennepin County Jail, Minneapolis, Minnesota

_____ under safe and secure conduct before

the United States District Court for the District of Minnesota at

 Minneapolis   , Minnesota, on the   26th day of   May        ,

19  87, at   3:00   o'clock  p.m. of said day, and each day

thereafter as may be necessary, for the purpose of _____

 Initial Appearance       and from time to time thereafter for

FILED  NOV 09 1987
FRANCIS E. DOSAL, CLERK
DEPUTY CLERK'S INITIALS

I HEREBY CERTIFY AND RETURN THAT I HAVE [illegible] THIS WRIT IN PART, ON THE

1ST DAY OF JUNE 1987 BY TAKING CUSTODY OF THE WITHIN-NAMED

JERRY JON MARTIN AT HENN CNTY JAIL

AND TRANSPORTED HIM TO U.S. DISTRICT COURT WHERE HE

WAS COMMITTED INTO THE CUSTODY OF U.S. MARSHAL

ON THE 1ST DAY OF JUNE 19 87

Robt L. PAULAK SR
UNITED STATES MARSHAL

William WENZEL
DEPUTY

---

I HEREBY CERTIFY AND RETURN THAT I HAVE [illegible] THIS WRIT IN PART, ON THE

5th DAY OF JUNE 1987 BY TAKING CUSTODY OF THE WITHIN-NAMED

Jerry Jon MARTIN AT Henn. Co. JAIL

AND TRANSPORTED HIM TO U.S. Clerk of Courts to Post Fed. Bond + returned to Henn Co. Jail WHERE HE

WAS COMMITTED INTO THE CUSTODY OF Henn. Co. Sheriff

ON THE 5th DAY OF June 19 87

Robert. L. PAULAK SR
UNITED STATES MARSHAL

Charles R. Stacy
DEPUTY

---

U. S. MARSHAL'S [illegible]

I HEREBY CERTIFY AND RETURN THAT I HAVE [illegible] THIS WRIT IN PART, ON THE

_____ DAY OF _____ 19 ___ BY TAKING CUSTODY OF THE WITHIN-NAMED

_____ AT _____

AND TRANSPORTED HIM TO _____ WHERE HE

WAS COMMITTED INTO THE CUSTODY OF _____

ON THE _____ DAY OF _____ 19 ___

_____
UNITED STATES MARSHAL

_____
DEPUTY

further proceedings in said matter, and upon conclusion thereof
to return said defendant to the custody from which he (she) came
under safe and secure conduct in accordance with the law and have
you then this WRIT.

WITNESS:  The Honorable  Floyd E. Boline
          ~~Judge xxx~~ Magistrate of said Court, and
          the Seal of said Court, hereunto
          affixed at  Minneapolis, MN
          in said district this  27th
          day of  May            , 19  87  ,
          on duplicate originals hereof.


          FRANCIS E. DOSAL, Clerk


          BY: *Judith C. Palmer*
          Deputy Clerk

CASE 0:87-mj-00551    Document Filed 07/09/87    Page 4 of 66

1

# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

### FOURTH DIVISION

United States of America,       CASE NO. FEB   87-0551

        Plaintiff,

   vs.                          DATE:   June 1, 1987

Terry Jon Martin,

        Defendant.         MINNEAPOLIS, MN


# TRANSCRIPT OF PROCEEDINGS

## BEFORE U. S. MAGISTRATE FLOYD E. BOLINE


APPEARANCES:

For Plaintiff:  DOUGLAS PETERSON, Asst. U. S. Atty.

For Defendant:  JAMES D. O'CONNOR, Esq.

FILED    **JUL 0 1 1987**

FRANCIS E. DOSAL, CLERK

BY _____

           DEPUTY

## I N D E X

### WITNESSES

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| W. Powers | 3 | 14, 38 | | |
| D. Carlton | 24 | 28 | 37 | |
| G. Haertel | 45 | 48 | | |

### EXHIBITS

| | Page Received |
|---|---|
| Gov. 1 | 25 |
| 2 | 28 |
| Deft. 1 | 40, 44 |
| 2-4 | 44 |

June 1, 1987

1

2      THE COURT:  We are here this afternoon on a

3  preliminary hearing and a detention hearing.

4      Is the defendant present in court?

5      MR. O'CONNOR:  Yes, Your Honor.

6      THE COURT:  Why don't counsel state your name and who

7  you are representing so that will appear on the record?

8      MR. O'CONNOR:  I am James O'Connor, Your Honor, with

9  Faegre and Benson, representing the defendant, Terry Jon

10  Martin.

11      MR. PETERSON:  Douglas R. Peterson, for the

12  government.

13      THE COURT:  Is the government ready to proceed, Mr.

14  Peterson?

15      MR. PETERSON:  It is, Your Honor.  The government has

16  three witnesses this afternoon, the first of those being

17  Walt Powers.

18                  WALTER J. POWERS

19          Being duly sworn, testified as follows:

20              DIRECT EXAMINATION

21      THE CLERK:  State your name and spell your last name.

22  A   Walter J. Powers, P-o-w-e-r-s.

23      MR. PETERSON:

24  Q   Mr. Powers, what do you do for a living?

25  A   I am a detective with the Hennepin County Sheriff's

1    Department.

2    Q    How long have you been with the sheriff's department?

3    A    About seventeen and a half years.

4    Q    And has your work included criminal investigation

5    experience?

6    A    Yes, it has.

7    Q    How many years of that?

8    A    About five and a half years in criminal

9    investigations, and three years in undercover narcotics.

10    Q    Are you familiar with Terry Jon Martiln?

11    A    Yes, I am.

12    Q    If Mr. Martin is present in the courtroom, please

13    identify him for the court.

14    A    He's the man seated at the counsel table behind you,

15    wearing the blue vee-neck pullover shirt, reddish hair,

16    and a beard, light beard.

17         MR. PETERSON:  May the record reflect the witness has

18    identified the defendant?

19         THE COURT:  The record so reflects.

20         MR. PETERSON:

21    Q    How is it that you know Mr. Martin?

22    A    I arrested Mr. Martin in February of 1986, and have

23    seen him in a number of instances since then.

24    Q    For what did you arrest him in February of 1986?

25    A    Receiving or concealing stolen property.

5

Q    Has that matter been disposed of?

A    No, it hasn't (shakes head in a negative manner).

Q    The charges are still pending?

A    They are -- in state court.

Q    Which division of state court?

A    Hennepin County District Court.

Q    Have you recently received some reports regarding Mr. Martin?

A    Yes, I have.

Q    On what dates?

A    On May 20, 1987 I received a teletype from the chief of police in Frazee, Minnesota -- this was about 8:15 in the morning, while I was preparing to go to court on Mr. Martin's trial, that was scheduled for 9:00 o'clock that morning in Hennepin County District Court.

Q    Who is the person that sent that report?

A    The teletype came from a Kelly Shannon, who was the chief of police in Frazee, Minnesota.

Q    What information was provided by the teletype?

A    The teletype itself said that the chief of police was looking for any additional information concerning Mr. Martin, and two associates that were with him, in the early morning hours of the 20th, up in Frazee.

     The teletype indicated that the chief thought that he had possibly broken up a drugstore burglary attempt.

Q ' What did you do, after receiving that teletype?

A   I called the chief of police up in Frazee.

Q   What information did he give you?

A   He reiterated what he had said in his teletype, indicated that he had patted down Mr. Martin and Mr. Emerson at the scene, described a coat, that Mr. Martin was wearing, as a blue parka with plaid lining; and it had -- in the chief's words -- a funny pocket sewn on the inside of the coat.

I asked him if it could possibly have been a "booster" coat, and he didn't know what a booster coat was, but he described it again, and it sounded as if it could be what is commonly referred to as a booster or a shoplifting coat.

Q ' What do you mean by a booster or shoplifting coat?

A   It is a coat that has a special lining sewn into it to facilitate shoplifting.

People wear this when they go into a store, and then they use the concealed pockets to hide merchandise that they steal from the stores.

Q   What other information did Chief Shannon provide you at that time?

A   Chief Shanon indicated that he had asked Mr. Martin if he could inspect the trunk of the vehicle, and Mr. Martin opened the trunk for him.  And he said he could

1  observe tools -- including a long pry bar type tool, and

2  he said he also had some vise grips and other tools.  And

3  in the teletype he had said these are the types of tools

4  used from break-ins.

5  Q    Based on your experience, what was the significance

6  of those tools?

7  A    The significance was, with Mr. Martin's record --

8  which I was aware of at the time -- in possession of those

9  tools, it would constitute possession of burglary tools

10  for Mr. Martin.

11  Q    Did you receive any other reports concerning Mr.

12  Martin around the 20th of May?

13  A    Yes.  The following day I received a report from

14  Deputy Stingline of the Hennepin County Sheriff's Patrol

15  Division, who indicated that on the evening of May 19,

16  1987, Mr. Martin was observed by the manager of a Union 76

17  gas station in Rogers.

18      At that time this individual concealed 10 to 12 tee

19  shirts in a coat described as a dark blue parka.

20      And when he was approached by the manager, this

21  individual threw the tee shirts down and exited the store

22  and entered a vehicle described as a dark blue Cadillac,

23  and it had license plates on it that registered to Mr.

24  Martin.

25  Q    Who checked those license plates?

1    A    They were checked by the deputy that sent in the

2    report.  And I also had checked the license number

3    provided by the chief up at Frazee, as the vehicle that

4    Mr. Martin and these other individuals were in, in the

5    early morning hours of the 20th.

6    Q    What did you do, after receiving these reports on the

7    20th and 21st of May?

8    A    I attempted to find Mr. Martin and his vehicle, with

9    the idea of impounding the vehicle and obtaining a search

10    warrant, and searching for the booster coat and burglary

11    tools.

12    Q    Did you obtain a search warrant?

13    A    I did obtain a search warrant the early morning of

14    the 22nd, and then I --

15    Q    Before you go on --

16    A    Go ahead.

17    Q    From whom did you obtain that warrant?

18    A    Judge Michael Davis of the Hennepin County District

19    Court signed the warrant.

20    Q    And you executed that warrant?

21    A    Yes, I executed the warrant, with the assistance of

22    several other deputies, just outside of this building on

23    the early morning of -- well, the late morning, I should

24    say, of the 22nd of May.

25    Q    What was found?

A     We found the booster coat that was described by the chief of police up in Frazee and by the manager of the Union gas station, Union 76 gas station.

We found the burglary tools -- or the tools that were described by the chief of police in Frazee.

And we also found some rather sophisticated burglary tools concealed in the back of the vehicle, with 800 tablets of Ritalin.

Q     What is Ritalin?

A     Ritalin is a Schedule Two controlled substance.   It is an amphetamine-type stimulant that is commonly used to treat hyperactive children.

For some reason, amphetamines work the opposite on hyperactive children, and slow them down.

But on adults, it would act much as an amphetamine. It would be a stimulant.

Q     Have those tablets been analyzed by anyone?

A     They were turned over to the city chemist for analysis.   She examined them and compared them with a Physician's Desk Reference book that she has, and stated that -- in her opinion -- they were pharmaceutical Ritalin, and that she would conduct infrared and other chemical tests, to make sure that they were.

I haven't heard the results of those chemical tests as of right now.

1    Q    So that conclusion was based on her observation, and

2    not on any tests that she conducted.

3        Is that right?

4    A    That's correct.

5    Q    Based on your experience, are you familiar with the

6    quantities of Ritalin that would be typical of

7    distribution, as opposed to use?

8    A    800 tablets would be a quantity for distribution,

9    rather than for personal use.

10   Q    Have you received any information as to how Mr.

11   Martin obtained those tablets?

12   A    I learned that there had been a drugstore burglary on

13   May 15 at the Snyder Drug Store located in New Hope,

14   Minnesota; and that, during that burglary, Ritalin was

15   taken -- along with quite a variety of other drugs.

16       The New Hope Police Department investigated a

17   complaint of the burglary, and of spotting a car in the

18   parking lot the day before -- and the druggist felt that

19   they were being cased at that time; this would have been

20   on the 15th -- the burglary actually occurred on the 16th,

21   and it was reported to the police on the 17th of May.

22   Q    Who provided you with all this information?

23   A    The New Hope Police Department.

24   Q    And did they provide you with any information

25   regarding Mr. Martin?

A    Yes.  They indicated that an individual had been
traced, through a license number, and this person was
identified as Fred King, and he stated that he was in the
company of a man by the name of John Emerson and an
individual known as Terry -- the last name was something
other than Martin -- but he gave a physical description
which matched very closely to Mr. Martin.  And --

Q    Now you are testifying about information that Mr.
Fred King gave to whom?

A    The New Hope Police Department.  I have a copy of his
statement.

In that statement he indicated that he had been with
Mr. Emerson and this Terry the day before, at the drug
store in New Hope, where Mr. Emerson and Terry had gone
inside to case the drugstore with the idea of burglarizing
it.

Mr. King stated that, the following day, he was told
that they were going to go and burglarize that drugstore
in the evening.

Mr. King indicated that he drove to the drug store at
about 8:00 o'clock in the evening, and he observed Mr.
Emerson seated in a vehicle parked in the parking lot.

And he described that vehicle as a dark blue, older
Cadillac.

He asked Mr. Emerson if they were going to do it, and

1    Mr. Emerson stated that "Terry's inside doing it right

2    now."

3        King went inside the drug store just to see what was

4    going on; didn't see anything; left; and received a call a

5    little later, from Mr. Emerson, who told him that they had

6    been quite successful, and listed several drugs that they

7    had taken -- including a large quantity of Ritalin -- and

8    agreed to meet Mr. King and give him something for driving

9    them around the day before.

10       But when Mr. King met at the prearranged time,

11    Emerson and this Terry didn't show up.

12    Q   As part of the police investigation, were any checks

13    made with the Snyder's Drug Store in that Midland Shopping

14    area?

15    A   Yes.

16    Q   What were the results of that investigation?

17    A   The Midland -- or the Snyder Drug Store supplied the

18    police department with a list of drugs that were taken,

19    including the Ritalin.

20       There were four different dosage units taken of

21    Ritalin.

22       And the dosage -- there were four different dosage

23    units of Ritalin taken from Mr. Martin's car during the

24    execution of the search warrant, on the 22nd.  The number

25    of Ritalin that were taken, that were reported taken

1   during the drug store burglarly were exactly double of

2   what Mr. Martin had in his possession.  So Mr. Martin had

3   half of the Ritalin that had been taken in that drug store

4   burglary.

5   Q    Are any state charges pending, as a result of your

6   execution of the search warrant on -- I believe it was --

7   the 22nd of May 1987?

8   A    Yes.

9   Q    What charges are pending?

10  A    Possession of shoplifting gear, which is a felony;

11  possession of burglary tools, which is also a felony; and

12  possession with intent to distribute a Schedule Two

13  conrolled substance -- the Ritalin.

14  Q    Has anyone else been arrested besides Mr. Martin?

15  A    Not in conjunction with the execution of that search

16  warrant.

17  Q    Have any statements been taken from Mr. Emerson?

18  A    Yes.

19       Mr. Emerson was arrested, but not in conjunction with

20  the search warrant conducted on Mr. Martin's car.

21       He was arrested Friday; and, after being advised of

22  his rights per Miranda, admitted that he was with Mr.

23  Martin, outside the drugstore, on the 15th; denies any

24  involvement in a burglary; but indicated that they were

25  with Mr. King the day before the burglary.  He also --

1   Q    Did he provide you any statements, regarding Mr.

2   Martin, other than those you have just testified to?

3   A    Yes.  He said that he thought that Mr. Martin was

4   preparing to flee because he didn't want to appear in

5   state court on the receiving and concealing stolen

6   property charges.

7        MR. PETERSON:  I have no further question of this

8   witness.

9        THE COURT:  You may cross examine.

10                    CROSS EXAMINATION

11       MR. O'CONNOR:

12  Q    If I understand your testimony correctly, you seized

13  the Ritalin pursuant to a warrant that was issued by Judge

14  Michael Davis.

15       Is that correct?

16  A    That's correct.

17  Q    And that warrant authorized you simply to find a blue

18  coat and burglary tools?

19  A    That's correct.

20  Q    Did the warrant authorize you to open up Mr. Martin's

21  vehicle, the trunk?

22  A    Did it authorize me to open his trunk?

23  Q    Right.

24  A    It authorized me to search the vehicle.

25  Q    And I take it -- did you search the trunk?

1    A    I searched the trunk, yes.

2    Q    Where did you find the blue coat?

3    A    I found that in the, directly behind the driver's

4    seat, partially on the floor and partially on the seat.

5    Q    Where did you find the vise grips and the pry bar?

6    A    I believe the pliers and the plier-type tools were

7    found in the trunk, and the pry bar.

8    Q    Where was the Ritalin found?

9    A    The Ritalin was found under an ash tray that -- the

10   screws had to be removed from the back seat of the car,

11   and the Ritalin was in a bag.

12        With this bag were two other plastic bags containing

13   very sophisticated lock-picking --

14   Q    Let me slow you down there; do it one at a time.

15   A    Okay.

16   Q    You get into the car and, I take it -- what did you

17   search first?  The back seat?

18        MR. PETERSON:  Your Honor, I'm going to object to

19   this line of questioning.  I don't mind if some general

20   questions are asked in this regard; but extensive

21   questioning -- in this area -- is irrelevant to this

22   proceeding.

23        MR. O'CONNOR:  Your Honor, I don't think I am asking

24   for extensive discovery at this point.  All of this

25   relates to the search warrant that he was executing at the

1     time.

2          THE COURT:  Are you contesting the fact that he could

3     search any part of the car that he wanted to?  Is that

4     your point?

5          MR. O'CONNOR:  No.  I'm suggesting, Your Honor, that

6     he had the authority to search for the burglary tools and

7     the blue coat.  Now I am trying to determine where in fact

8     the Ritalin was discovered.  It's the --

9          MR. PETERSON:  Go ahead.  Why don't you ask the

10    question again?  I think we lost track of what it was.

11         THE COURT:  Mr. Reporter, would you read the question

12    back?

13            (Question read)

14         MR. O'CONNOR:

15    Q    What I am getting at is:  What did you search first?

16    What part of the car?

17    A    I would say we searched the trunk first.

18    Q    And, again, you were looking for the blue coat and

19    the burglary tools and, specifically, you were looking for

20    the pry bar and the vise grips.

21         Is that correct?

22    A    I was looking for burglary tools including, but not

23    limited to, those; yes.

24    Q    Is it fair to say that the only burglary tools -- or

25    the only tools that you were told about were the pry bar

1    and the vise grip or the pliers that you described

2    earlier?

3    A    That's correct.

4    Q    Do you understand or have you heard that Mr. Martin

5    works with his brother as a carpenter?

6    A    Have I heard that?

7    Q    Yes.

8    A    I have heard that he -- I don't believe that I have

9    heard he works with his brother as a carpenter.  I have

10   heard he works as a carpenter for a construction company.

11   Q    Okay.  So you open up the trunk first.  What did you

12   find in the trunk?

13   A    Well, there were several suitcases, the soft-leather

14   sided types of suitcases.

15   Q    What did you find in them?

16   A    Well, there was some narcotics paraphernalia,

17   injection equipment.  There was a couple traffic citations

18   to Mr. Martin.  There were other letters addressed to Mr.

19   Martin, in the suitcases.  Clothes.

20   Q    Is that about it?

21   A    I guess -- that's being very broad, but there were a

22   lot of things in the suitcase -- there were several

23   suitcases.

24        There was some makeup, some toiletries, shaving

25   equipment.

1    Q    With respect to what you have described as narcotics

2    paraphernalia, what was that located in?

3    A    It was in a suitcase.

4    Q    Was it located within something within the suitcase?

5    A    I would say yes, but I don't recall exactly if it was

6    like a shaving kit or something like that, I don't recall.

7    It was in something in one of the suitcases.

8    Q    Okay.  After you searched the trunk, then where did

9    you go?

10    A    The interior of the car.

11    Q    And I take it the blue coat was --

12    A    I knew that the blue coat was there.

13    Q    You could see it?

14    A    Right.  When we opened up the passenger's -- or the

15    driver's side of the car, you could see the blue coat.

16    Q    And there wasn't anything in the blue coat, I take

17    it?

18    A    Driver's license.

19    Q    Okay.  Other than that, that was about it?

20    A    That was it.

21    Q    Did you already tell me that you found the pry bar

22    and the pliers in the back trunk?

23    A    Yes.

24    Q    You didn't find any other ostensible burglary

25    equipment in the trunk, other than that?

1    A    Oh yes.

2    Q    What else?

3    A    Quite a bit.

4    Q    What else?

5    A    There were pliers, there were portable drills, there

6    were punches, gloves, police scanners; quite a variety of

7    what I would classify as burglary tools.

8    Q    Okay.  You would agree, also, wouldn't you, that

9    pliers, punches, portable drills are all tools that

10    carpenters use?

11    A    Yes.

12    MR. PETERSON:  Objection, lack of foundation, Your

13    Honor.

14    THE COURT:  That; and it is not relevant, anyway --

15    at least not relevant to this proceeding.

16    MR. O'CONNOR:

17    Q    Is it fair to say that what was identified to you

18    from the chief of police, about what was seen in Mr.

19    Martin's car -- that you have described as burglary

20    tools -- are the tools that you found in the trunk?

21    Do you understand my question?

22    A    I understand your question.

23    I would say that the answer to the question would be

24    "yes."

25    Q    Now you were telling me that the Ritalin was located

underneath an ashtray?

A    That's correct.

Q    Can you describe to me how big this ashtray is?

A    Oh, it's approximately 7 or 8 inches long, by 2-1/2, 3 inches wide.

Q    Where was it located?

A    In the arm rest, on the passenger's side, in the back seat.

Q    Okay.  Was it one of those ash trays you can just pull out and push back, in the side of car -- or in the panel?

A    It's the type --

MR. PETERSON:  Your Honor, at this point I would renew my objection to this line of questioning, as outside the scope of the proceedings and more appropriate for a suppression hearing.

THE COURT:  Overruled.

A    It's the type of ash tray where you lift up a little door, and put your ashes in it.

The ash tray assembly was physically removed when we found the items underneath it.

Q    That's what I'm getting at.  As you look at the thing itself, the ashtray itself -- while it's sitting in the car -- was it just a little, couple of inches in diameter, the top of it that you flip up and flip down?

1    A   No.   The brass -- it was all contained in kind of a

2    chrome, rectangular shape, about 8 inches long, 7, 8

3    inches long, and about 2-1/2 to 3 inches wide.

4        And then there was a small portion that you'd lift

5    up, and you could see the ash tray, and there was a

6    cigarette lighter in there, also -- or about 4 cigarette

7    lighters.

8    Q    Okay.  Did you have to remove the entire assembly,

9    the 7-inch long assembly?

10   A    Yes.

11   Q    OKay.  So what did you do then?  What made you decide

12   to remove that?

13   A    We were conducting a search, looking for burglary

14   tools.

15   Q    Okay.  And decided to remove the ashtray?

16   A    That's right.

17   Q    Tell me:  What did you find in there, besides the

18   Ritalin?

19   A    We found a large, I would describe as a nipper-type

20   tool.  That is, it's a pincher that -- when it's closed --

21   the mouth of it only closes to about 1 inch, but when it's

22   opened it could grab ahold of anything from -- oh --

23   probably 3 or 4 inches down to an inch, and grab it

24   solidly.  And it had handles on it approximately 12 inches

25   long.

1    -   And there were also 2 plastic bags containing lock

2    picks -- which are relatively sophisticated devices used

3    to open locks.

4    Q    Do you happen to know if anybody had access to that

5    car before you searched it, other than Mr. Martin?

6    A    I have no idea.

7    Q    Has anybody started any criminal proceeding as a

8    result of the suggestion that somebody -- that matched Mr.

9    Martin's description -- stole tee shirts or attempted to

10   steal tee shirts out of a Union 76 station?

11   A    Yes.

12   Q    Who has started those criminal proceedings?

13   A    I have started the investigation.

14   One of my partners showed a photo lineup to the

15   manager, I believe it was Friday -- no -- Thursday night.

16   And I've been off work, so I don't know what the

17   results of that were.

18   Q    As we sit here today, you can't say that Mr. Martin

19   was in fact that person.

20   Is that fair to say?

21   A    Mr. Emerson -- when I interviewed Mr. Emerson, he

22   told me that Mr. Martin got caught trying to steal some

23   tee shirts when they were on their way up to Frazee, and

24   that he was wearing a blue parka at the time.

25   Q    Do you know whether or not any fingerprints were

1   recovered at the Snyder Drug Store?

2   A    No, I don't.

3   Q    Is it fair to say that nobody at the Snyder Drug

4   Store has been able to identify either Mr. Emerson or Mr.

5   Martin, to your knowledge?

6   A    I do not know.

7        Detective Link, from New Hope, was conducting that

8   investigation.

9        Once again, I have been off work, and I'm off today,

10  and I'm not coming back until Wednesday -- at which time

11  I'll talk to various people and find out what the outcome

12  of this was.

13       So I do not know.

14  Q    So as we sit here today, to your knowledge, nobody at

15  the drugstore has identified either Mr. Emerson or Mr.

16  Martin as burglars?

17  A    As being at the drug store?

18  Q    Right.

19  A    As far as I know, no one has identified either one of

20  them.

21       Fairly detailed escriptions, however, have been given

22  of both of these people.

23       MR. O'CONNOR:  I have nothing further.

24       THE COURT:  Any redirect, Mr. Peterson?

25       MR. PETERSON:  None, Your Honor.

1       THE COURT: You are excused, thank you.

2       MR. PETERSON: The government calls Dale Carlton.

3                    DALE CARLTON

4        Being duly sworn, testified as follows:

5             DIRECT EXAMINATION

6       THE CLERK: State your name and spell your last name.

7   A   MY name is Dale L. Carlton, last name is spelled

8  C-a-r-l-t-o-n.

9       MR. PETERSON:

10   Q   Mr. Carlton, what do you do for a living?

11   A   A United States probation officer for the District of

12  Minnesota.

13   Q   How long have you done that?

14   A   Since January 1974.

15   Q   And briefly, what are your duties?

16   A   Basically two duties.

17       One is to write pre-sentence investigations.

18       The other is to supervise people on parole or

19  probation, as well as to do some pretrial work for people

20  on bond supervision.

21   Q   As part of your work do you also obtian criminal

22  records for charged individuals?

23   A   Yes.

24   Q   How do you go about obtaining those records?

25   A   After an initial interview with a client who's pled

1    guilty or found guilty, we do a computer check, we get

2    whatever information we can from the client, and do the

3    routine local computer checks, record checks.

4    Q    Has your office had occasion to supevise Terry Jon

5    Martin?

6    A    Supervise him on bond supervision, yes.

7    Q    And in connection with what case has he been

8    supervised.

9    A    Supervised under a case from Judge Renner's

10   courtroom.  I believe it was a firearms case.

11   Q    I show you what has been marked as Government Exhibit

12   1.  Can you identify that document?

13   A    Yes.  This is an order setting conditions of release

14   for an individual who has been placed on bond.

15        MR. PETERSON:  Your Honor, the government offers

16   Exhibit 1.

17        MR. O'CONNOR:  No objection.

18        THE COURT:  Government Exhibit 1 will be received.

19             (Govt. Exh. 1 received)

20        MR. PETERSON:

21   Q    Mr. Carlton, was your office responsible for

22   supervising Mr. Martin in connection with the bond

23   conditions referenced in Exhibit 1.

24   A    Yes.  We supervised him from somewhere in March of

25   '87.  Prior to that, he was on an unsecured bond.

1    Q    Were any additional conditions ever set by the court,

2    over and above those referenced in Exhibit 1?

3    A    Yes.  He was supposed to report by telephone before

4    noon on every Monday and Thursday.

5    Q    What is the reporting history of Mr. Martin?

6    A    Very spotty.

7         The first indication in the file would be reporting

8    on March 9, 1987.  From that point he failed to report on

9    the 12th and 16th of March 1987.  And I contacted him --

10   or I contacted the address where he was supposed to be

11   living at in Grand Rapids, Minnesota, spoke to an

12   individual who was not Mr. Martin, and said that it was

13   important that Mr. Martin get ahold of me.

14        That was on the 18th of March, that I made the phone

15   call.

16        On the 19th, Mr. Martin called me on the phone at

17   9:30 in the morning; said that he had called in late on

18   the 16th, but he doesn't remember who he spoke to; said

19   that oftentimes he's down in the Twin Cities area, and

20   gave me -- said he was staying with a girlfriend in St.

21   Paul, and gave me a phone number there.

22        After that he called in on the 23rd of March, 26th,

23   and 30th of March.  And that was the last time he called

24   in.

25        The next time I saw him was when a jury verdict was

1    returned on the 17th of April.  That was my next contact

2    with him.

3         After that, the next time I had contact with him was

4    the 22nd of May.

5    Q    What jury verdict came in on the 17th of April?

6    A    It was another case that Mr. Martin had pending in

7    front of Judge Murphy on some narcotics charges -- of

8    which he was acquitted.

9    Q    And what is the status of the case referenced in

10   Exhibit 1?

11   A    That would be the firearms case in front of Judge

12   Renner, and my understanding is that it is on appeal by

13   the government to the circuit court.

14   Q    As part of your work, you also had occasion to obtain

15   the criminal record of Mr. Martin?

16   A    Yes.

17        THE COURT:  Is that Government Exhibit 2?

18        MR. PETERSON:  Government Exhibit 2.

19   Q    And I will show that to the witness and ask the

20   witness to identify it.

21   A    It is what is commonly referred to as an FBI Rap

22   Sheet, or a history of the convictions submitted to the

23   FBI.

24        MR. PETERSON:  The government offers Exhibit 2.

25        THE COURT:  Any objection?

1      MR. O'CONNOR:  No objection, Your Honor.

2      THE COURT:  Government Exhibit 2 will be received.

3          (Govt. Exh. 2 received)

4      MR. PETERSON:

5  Q   Mr. Carlton, what felony convictions are reflected in

6  Government Exhibit 2?

7  A   There are a number of felony convictions:

8      1967, aggravated assault.

9      1967, simple robbery.

10     1972, burglary, forced entry.

11     1976, burglary.

12     1977, in the State of Iowa -- the previous ones were

13  all in Minnesota -- 1977 in Iowa, burglary with

14  aggravation.

15     That appears to be the last felony listed on here.

16     MR. PETERSON:  I have no further questions of this

17  witness.

18     THE COURT:  You may cross examine, Mr. O'Connor.

19                    CROSS EXAMINATION

20     MR. O'CONNOR:

21  Q   It is fair to say then, based on what you have just

22  said, that the last felony -- that is represented on

23  Government Exhibit 2 -- is 10 years ago?

24  A   Yes.

25  Q   With respect to the case that was before Judge

1    Murphy, it was a drug case, was it?

2    A    Yes.

3    Q    Do you know -- was it a multiple count drug case, do

4    you recall?

5    A    I believe it was two counts.

6    Q    And the jury returned not-guilty verdicts on both

7    counts of the indictment?

8    A    Yes.

9    Q    And with respect to the case in front of Judge

10    Renner, it was a what?

11    A    My understanding was it was a firearms case.

12    Q    And is it your understanding that Judge Cudd issued a

13    report and recommendation that ruled that evidence that

14    was seized was inadmissible, which was affirmed by the

15    district court, and that is what is on appeal right now?

16    A    That is my understanding.

17    Q    Is it fair to say, Sir, that if you believe somebody

18    under your charge was not complying with the terms and

19    conditions of his probation or his conditional release,

20    that you could violate that person -- or attempt to

21    violate that person?

22    A    I could recommend that, yes.

23    Q    Okay.  And I take it, based on your years of

24    experience, you only do that when you think there's a real

25    reason to do that.

1    Is that fair to say?

2  A    Right.

3  Q    You don't violate anybody just because he missed a

4  couple of terms or conditions under their parole -- or,

5  excuse me -- their conditional release.

6    Is that a fair statement?

7  A    That's correct.

8  Q    So ultimately it is a judgment call you've got to

9  make, whether or not you think somebody is complying with

10  the spirit of conditional release?

11  A    Right.

12  Q    And it is fair to say, isn't it, that with respect to

13  Mr. Martin, nobody from the FPO office decided to attempt

14  to violate him.

15    Is that fair to say.

16  A    What is the "FPO office"?

17  Q    Well, the parole office -- I'm sorry -- the parole

18  office.

19  A    Yes.

20  Q    No one?

21  A    No.

22  Q    And is it fair to say that, based on what you know,

23  Mr. Martin made every single appearance that was required

24  of him, both in front of Judge Murphy and in front of

25  Judge Renner?

1   A    As far as I know.

2   Q    Does your office also do investigations determining

3   bail conditions?

4   A    Yes.

5   Q    Okay.  And is it fair to say that your office can

6   recommend to the United States Attorney's office, or

7   others, that they take a position that no bail is offered

8   or that other types of conditions are set on a release?

9   A    We would make --

10       MR. PETERSON:  Objection, irrelevant.

11       THE COURT:  Overruled.

12   A    We would make that recommendation to the judicial

13   officer.

14       MR. O'CONNOR:

15   Q    Were you the person that was assigned to Mr. Martin

16   in the Judge Murphy and Judge Renner cases?

17   A    I was assigned to do the presentence investigation

18   for Judge Murphy.

19       I was assigned to do the pretrial services for the

20   bail case for Judge Renner, once the conditions were

21   changed.

22   Q    Okay.  The deal for Judge Murphy went by the boards

23   when the jury returned a not-guilty verdict?

24   A    Right.  There was no bond supervision in that case.

25   Q    Okay.  But there could have been, though, right?

1    A    There could have been.

2    Q    Then your office -- if it chose to -- could have

3    desired to set certain limitations and restrictions of his

4    release pending trial.

5         Is that fair to say?

6    A    We could have made that recommendation.

7    Q    And you didn't; right?

8    A    I didn't, no.

9    Q    And neither did your office; correct?

10   A    Not that I am aware of.

11   Q    And is it also fair to say that Government Exhibit 2

12   was available for your office's use when your office

13   decided not to ask for any bail restrictions?

14   A    Well, the office did subsequently ask for bail

15   restrictions.

16   Q    Do you know whether or not -- let's slow down.

17        First of all -- let's talk about Judge Murphy's case,

18   first.  They originally did not ask for any restrictions

19   with respect to release.

20        Is that fair to say?

21   A    Right.

22   Q    Okay.  And at that time, Government Exhibit 2 was

23   available to your office.

24        Is that a fair statement?

25   A    At the time of the first appearance?

1    Q    Yes.

2    A    Possibly.  It is not probable.

3    Q    It's not probable?

4    A    No (shakes head in a negative manner).

5    Q    Well, do you think it is probable that -- if you

6    chose to -- the United States Federal Bureau of

7    Investigation could have put together a rap sheet on Mr.

8    Martin?

9    A    Oh, sure.

10        MR. PETERSON:  Objection, lack of foundation,

11   irrelevant, hypothetical.

12        THE COURT:  sustained.

13        MR. O'CONNOR:

14   Q    The information that is contained in Exhibit 2 was

15   available to your office, when your office chose not to

16   ask for any bail restrictions before Judge Murphy

17   initially.  True or false?

18   A    I don't know.  I didn't handle it.

19   Q    Well, if you didn't handle it, you were suggesting

20   that -- later on -- there were some restrictions that were

21   asked of Mr. Martin here?

22        MR. PETERSON:  Objection to the form of the question.

23   It is extremely unclear whether you are talking about the

24   Judge Renner case or the Judge Murphy case, and we are

25   slipping from one to the other.  I think, in order to make

34

1    the record clear, you should be explicit in your question.

2         THE COURT:  Sustained.

3         MR. O'CONNOR:

4    Q    Regarding Judge Murphy's case, I think you suggested

5    earlier that, later on in the proceedings, your office

6    asked for certain restrictions to be imposed upon Mr.

7    Martin.

8         Did I understand that correctly?

9    A    Restrictions, yes.

10   Q    What were those restrictions?

11   A    That he report by telephone before noon every Monday

12   and Thursday.

13   Q    Okay.  And those reports, did they have to come into

14   you?

15   A    Yes.

16   Q    Okay.  And you said earlier that he missed a couple

17   of times.  Right?

18   A    More than a couple.

19   Q    Okay.  When you said that the last time he called, to

20   your knowledge, was March 30, and then you saw him again

21   on April 17 -- the date of the jury verdict -- how many

22   days in there was he supposed to report to you, do you

23   recall?

24   A    If there are two days a week -- probably 4; possibly

25   5.

1    Q    If he's in trial, is it fair to say that you knew

2    where he was?

3    A    Sure.

4    Q    So you didn't have to worry about his fleeing?

5    A    Mm-hum.

6    Q    Is that why you weren't so concerned about whether he

7    called in from the 30th to the 17th?

8    A    That's correct.

9    Q    And, again, if you were really concerned about his

10   flight, or if you were concerned about whether he would

11   pose a danger to the community, you could have asked an

12   assistant U. S. Attorney -- or others -- to petition the

13   court to impose more restrictive bail conditions?

14        MR. PETERSON:  Objection; irrelevant.

15        MR. O'CONNOR:

16   Q    Is that fair to say?

17        THE COURT:  Overruled.

18   A    Yes.

19        MR. O'CONNOR:

20   Q    Let's talk about the Judge Renner case.  In that case

21   you told me that it was your job to detrmine original bail

22   setting conditions.  Did I understand that correctly?

23   A    No, I had nothing to do with his bail or Judge

24   Renner's case at all.

25   Q    Do you know anything about that?

1     A    No.

2     Q    As we sit here today, do you know whether Mr. Martin

3     was held without bail?

4     A    I assume that he wasn't because he was out on --

5     Q    Okay.  And the only way that -- is it fair to say

6     that, based on your years of experience and what you have

7     done -- is it fair to say that, if he is out, it's because

8     the government was not successful or did not seek to have

9     him held in detention without bail?

10    A    Objection, lack of foundation.

11        THE COURT:  Would you read the question back, Mr.

12    Reporter?

13          (Question read)

14        THE COURT:  Sustained.

15        MR. O'CONNOR:

16    Q    Who was it that was responsible for putting together

17    the papers regarding the bail consideration for Mr. Martin

18    before Judge Renner?

19    A    I really don't know.  His initial bail -- which I

20    believe was in July of '86 -- was conducted by a probation

21    officer, I think Pam MacNulty.

22    Q    Was that in your office?

23    A    She was.

24        MR. O'CONNOR:  That's all I have of this witness,

25    Your Honor.

37

1          Your Honor -- before I forget -- I neglected to ask

2     the first witness -- may I ask that he remain in the

3     courtroom until the government has finished?  Then I can

4     ask him a final question.

5          THE COURT:  Why don't you just ask him right now?  He

6     can answer from there.

7          MR. O'CONNOR:  That's fine, thank you.

8          MR. PETERSON:  So as not to confuse matters, perhaps

9     I could ask Mr. Carlton a couple of redirect questions, so

10    that we try not to break it up too much.

11         MR. O'CONNOR:  I'm sorry.

12         THE COURT:  All right.

13                    REDIRECT EXAMINATION

14         MR. PETERSON:

15    Q    Mr. Carlton, if you know, do you know why there were

16    no restrictions set in Judge Murphy's case?

17    A    No, I don't.

18    Q    Were you provided a permanent address by Mr. Martin

19    at some point during his supervision?

20    A    There -- on the release form, there was an address in

21    Grand Rapids, Minnesota.

22         MR. PETERSON:  No further questions.

23         THE COURT:  All right, you are excused.

24         As long as you've got some documents --.

25         Mr. Powers, why don't you come up to the stand again

1      for a minute?

2           Keep in mind, Mr. O'Connor, the validity of the

3      search warrant and its execution is not at issue at this

4      stage of the proceedings.

5           MR. O'CONNOR:  Yes, Your Honor.

6           MR. PETERSON:  Your Honor, I have no objection to

7      defense counsel showing, to the witness, what is marked as

8      Defense Exhibit 1.

9           I do have some problems with regard to Exhibits 2 and

10     3, but perhaps the best way to proceed would be simply to

11     let counsel ask the questions, and I can make the

12     objections at the appropriate time.

13          THE COURT:  All right.

14                         WALT POWERS

15     Being previously sworn, testified further as follows:

16                    CROSS EXAMINATION (Cont.)

17          MR. O'CONNOR:

18     Q    Mr. Powers, you made reference, a moment ago, to the

19     Physician's Desk Reference, otherwise known as the PDR.

20          Have I put in front of you the 1983 edition of the

21     PDR?

22          MR. PETERSON:  Objection, lack of foundation.

23          THE COURT:  Overruled.

24          MR. O'CONNOR:

25     Q    That is what you made reference to before, isn't it?

1   A    I don't know if it was this particular edition, but

2   it was the Physicians Desk Reference that I did refer to

3   earlier.

4   Q    Now if I understand what you said, what you indicated

5   was that a chemist with the City of Minneapolis apparently

6   looked at the pills and -- without doing any other

7   testing -- determined that they matched the picture in the

8   PDR.

9        Is that a fair statement?

10  A    Well, the chemist and myself and several other

11  individuals looked in the PDR and compared them; but

12  that's right.

13  Q    Okay.  I'm showing you what has been marked as

14  Defendant Exhibit 1.  Would you agree that this is page

15  409, 865 and 866 of the 1983 edition of the PDR?

16  A    Okay, the first page is a photocopy of page 409; the

17  second pagfe is a photocopy of page 865; and the third

18  page is a ;copy of 866.

19  Q    Okay, thank you.  And you would agree with me,

20  wouldn't you, that those are the sections in the PDR that

21  deal with the particular drug that you believe was seized

22  from the defendant, Mr. Martin?

23  A    That's correct.

24       MR. O'CONNOR:  I offer Exhibit 1.

25       MR. PETERSON:  Your Honor, I will object to the

1   introduction of Exhibit 1 to the extent defense counsel is

2   using it to fully define the characteristics of Ritalin.

3        The reasons for placing Ritalin, or any drug, on the

4   controlled-substance list are not necessarily confined to

5   the characteristics described in the PDR.

6        As a result, the government would object to the

7   introduction of Exhibit 1 for the purposes of this

8   proceeding.

9        THE COURT:  Well, I will overrule the objection and

10  receive it, just for the purposes of what it says in the

11  Desk Reference.  It is widely used in the legal

12  profession.

13       However, the court is aware that the statute

14  ultimately decides what is a controlled substance and what

15  isn't.

16            (Defendant Exh. 1 received)

17       MR. O'CONNOR:

18  Q   Mr. Powers, are you familiar with the schedules of

19  drugs in 21 United States Code, Section 812?

20  A   I have seen them --

21  Q   Yes.

22  A   -- but I don't know them by heart.

23  Q   Are you familiar with Exhibit 3, which is 21 United

24  States Code, Section 841(a)?

25       MR. PETERSON:  Your Honor, I object to this line of

1     questioning.

2          I believe all these questions are calling for legal

3     conclusions and asking the witness questions concerning

4     legislation -- which the Court is well aware of and can

5     take judicial notice of.

6          MR. O'CONNOR:  That's fine by me, Your Honor, if you

7     will take judicial notice of the statute and the schedule.

8          THE COURT:  I will take judicial notice of the

9     statute and schedule.

10          MR. O'CONNOR:  Thank you.

11          Then I offer Exhibits 2 and 3 for that basis.

12          THE COURT:  What is the purpose of the line of

13     questioning?

14          MR. O'CONNOR:  Your Honor, I promise that within a

15     minute you will understand the purpose of the questioning,

16     which is --

17          THE COURT:  Okay; I'm just pointing out -- as you I

18     am sure are aware -- the government does not have to prove

19     that the drugs found were actually a controlled substance.

20          MR. O'CONNOR:

21     Q    Okay, showing you what's been marked as Exhibit 4,

22     this I am sure we can concede and stiplulate is the

23     Complaint and, the Summons and Complaint in this

24     particular case, which charges the defendant with

25     possession of a Schedule 2 drug.

1          Would you agree with me?

2          MR. PETERSON:  Your Honor, I object to this line of

3     questioning with this witness.

4          I don't mind if counsel would like the court to take

5     judicial notice of the arrest warrant and complaint filed

6     in this case.  I believe the Court can do that in any

7     event.

8          But I do object to using this witness to ask

9     questions, which really are questions which should be

10     directed to the Court during argument.

11          MR. O'CONNOR:  Your Honor, this is the witness who

12     has identified my client as being in possession of the

13     drugs for which he is charged in the Complaint.

14          THE COURT:  All he says is that the drugs he looked

15     at and the chemist looked at, they thought were the drug

16     Ritalin.

17          He does not have to prove it was the drug.  All the

18     government has to show is that there is probable cause to

19     believe that it was a controlled substance.  It may not

20     even be the correct drug.

21          That doesn't mean he can't be bound over for the

22     purposes of this hearing.

23          MR. O'CONNOR:  Well, Your Honor, it seems to me that

24     the purpose of this hearing is to determine whether or not

25     there is probable cause to hold my client and bind him

1    over, for the Grand Jury to determine whether a crime has

2    occurred and he's done it.

3        He's been charged with possession of a Schedule 2

4    drug.

5        We've identified, through this witness and through

6    the PDR, what Ritalin is -- and it is not a Schedule 2

7    drug under the statute.

8        THE COURT:  Then I assume that, if he is indicted,

9    the indictment will be subject to a motion to dismiss.

10        MR. O'CONNOR:  But it seems to me that the purpose of

11    this hearing is to determine, with respect to this

12    particular Complaint, whether there is probable cause to

13    bind him over for what he's charged with.

14        And there isn't probable cause to bind him over for a

15    Schedule 2 drug that does not arise and is not articulated

16    in Schedule 2.

17        It seems the thing to do is to recharge with what in

18    fact he has possessed -- if anything.

19        So there isn't probable cause for this possession.

20        THE COURT:  But such an argument is properly

21    addressed to the court, as would the exhibits.

22        But questioning the witness about it certainly isn't

23    going to accomplish anything.

24        MR. O'CONNOR:  Well, I wanted to get it through the

25    witness who has identified the drug as Ritalin;  that's

44

1    why I did it through this witness.

2        But I'm done with him, anyway.  And I offer Exhibits

3    1 through 4.

4        MR. PETERSON:  Your Honor, I will object to the

5    introduction of Exhibits 2 and 3.  Those are simply -- as

6    I understand it -- photocopies of legislation.

7        I will take counsel at his word, that they are

8    photocopies of the current legislation which is in effect,

9    after the various amendments that have been made to the

10    Anti-Drug Abuse Act.

11        But I would still pursue my objection, that that

12    legislation is more appropriately left for the Court, and

13    not for the introduction of exhibits.

14        THE COURT:  Well, ultimately he is making the

15    argument; and whether I look at these, or go back and look

16    at the USC in my chambers, it's not going to make any

17    difference.

18        But you are excused in any event.

19        MR. O'CONNOR:  Thank you, Judge.

20        THE COURT:  I suppose -- I will receive all the

21    exhibits because there would be no prejudice.

22        (Deft. Exhs. 1-4, incl., received)

23        But I have to look at the statute, anyway, to make

24    sure this is the most current copy.

25        MR. PETERSON:  Very well.

1          Your Honor, the government has one more witness,

2     Sergeant Gordy Haertel.

3                         GORDON HAERTEL

4               Being duly sworn, testified as follows:

5                         DIRECT EXAMINATION

6          THE CLERK:  State your name and spell your last name.

7     A     My name is Gordon Haertel, H-a-e-r-t-e-l.

8          MR. PETERSON:

9     Q     What do you do for a living, Mr. Haertel?

10    A     Police officer in the City of Minneapolis.

11    Q     Briefly, what are your current duties?

12    A     I am an investigator with the department.

13    Q     Have you had occasion to conduct an investigation of

14    Terry Jon Martin?

15    A     Yes sir, I have.

16    Q     Why did you conduct that investigation?

17    A     We had received information that he was involved in

18    criminal activity.

19    Q     What type of a criminal activity?

20    A     Burglaries, selling marcotics, shoplifting.  We had

21    one report on fencing, but that was a minor --

22          MR. O'CONNOR:  Your Honor, I can't hear.

23          THE COURT:  Okay, try to speak a little louder.

24    A     Okay.

25          MR. PETERSON:

1    Q    When did you receive that information?

2    A    It's -- we started reeiving the information in the

3    Spring of 1986, and that continued all the way through

4    until just recently.

5    Q    Last Fall, did you have occasion to make some

6    inquiries regarding Mr. Martin?

7    A    Yes, I did (nods head in an affirmative manner).

8    Q    When did you make those inquiries, exactly?

9    A    It was approximately in the middle of November.

10   Q    And why did you initiate those inquiries?

11   A    I understood that he was out on bail and that he had

12   received instructions that his place of residence was

13   supposed to be Grand Rapids, Minnesota.

14        We had received information in our office that he was

15   an active drugstore burglar; and, also, that he was

16   selling narcotics and working with a partner out-state

17   Minnesota and out-of-state Minnesota; and, also, that he

18   was staying in a hotel in Minneapolis, rather in his

19   designated residence in Grand Rapids.

20   Q    How did you receive that information, regarding the

21   hotel stay?

22   A    Through the FBI.

23   Q    And how did they receive that information?

24   A    I believe it was through an informant -- but I am not

25   sure.

47

Q    And what did you do after receiving that report?

A    Special Agent Al Ness, with the FBI, and I went to --
I believe it was -- the Oak Grove Apartments,
approximately two blocks west of Nicollet on Oak Grove,
and asked the clerk there -- I believe it was a Mr.
Northon(phonetic) -- asked him if he had a Terry Martin
living in the hotel.

He said he thought he did.

He started going through his files, and hesitated,
and said that he didn't, he couldn't remember anyone by
that name for sure.

And I showed him a mug shot of Terry Martin, and he
identified Martin as Terry King, and showed us his
application for a room in that hotel.

Q    Did he tell you anything else about Mr. King, also
known as Mr. Martin?

A    Yes.

Q    What did he say?

A    He said that he kept very unusual hours.

He was gone two, three days at a time, usually came
in around 3:00, 4:00 o'clock in the morning, and that he
had been --

Q    Have you received any other information regarding
other residences occupied by Mr. Martin?

A    Yes sir, I have.

1   Q    From whom did you receive that information?

2   A    From the Minneapolis Narcotics Department and, also,

3   the Hennepin County Narcotics Division.

4   Q    What information have you received?

5   A    That Mr. Martin was living with a known narcotics

6   dealer in south Minneapolis.

7   Q    And when did you receive that information?

8   A    That was in the Fall of 1986, and that continued all

9   the way through until -- it was April of this year, I

10  think.

11       MR. PETERSON:   No further questions.

12                      CROSS EXAMINATION

13       MR. O'CONNOR:

14  Q    Mr. Haertel, do you know what the conditions of Mr.

15  Martin's release were, with respect to the state case that

16  is presently pending?

17  A    No sir.

18  Q    Do you know if he is on bail or not?

19  A    No sir.

20  Q    Is it fair to say that you have taken no steps -- as

21  far back as the Spring of 1986, or late in the Fall of

22  '87 -- to attempt to revoke any bail that he is presently

23  out on, with respect to his Hennepin County case?

24       True or false?

25  A    That is not true.

49

1      I've told everyone in the system, believing this bail

2    hearing would come up.

3    Q    So you have talked to people?

4    A    Yes sir.

5    Q    So you in fact know that he is on bail?

6    A    You asked if I knew the conditions.

7         I don't know the conditions.

8    Q    But you know in fact that he's been released?

9    A    Yes sir.

10   Q    And so with respect to -- at one end of the

11   spectrum -- detention without bail, we know that that is

12   not one of the conditions of his release in Hennepin

13   County.

14        True?

15   A.    Yes sir.

16        MR. O'CONNOR:  I have nothing further.

17        MR. PETERSON:  No further questions.

18        THE COURT:  You are excused.

19        Any other witnesses, Mr. Peterson?

20        MR. PETERSON:  None, Your Honor.

21        MR. O'CONNOR:  No witnesses, Your Honor.

22        THE COURT:  All right.

23        And I take it that is the entire submission, both on

24   the preliminary hearing and on the detention?

25        MR. PETERSON:  It is, Your Honor.

1      THE COURT:  All right.

2          At least as to Count 2, I find there is probable

3   cause to believe that the defendant committed an offense

4   while on appeal, that he did commit a felony while on

5   release pending an appeal, in violation of 18 USC 3147 1;

6   and I order -- as to that count -- he be held for further

7   action by the United States Grand Jury.

8          As to Count 1 involving the Ritalin, I thought we

9   would take a short recess so the statutes can be checked,

10  and determine whether or not Ritalin is or is not a

11  Schedule 2 controlled substance.

12         Why don't we take -- it's 10 after 3:00.  Why don't

13  we take a recess until 3:30, and that will give you -- Mr.

14  Peterson -- a chance to run downstairs, also, and see what

15  you can come up with.

16         MR. PETERSON:  Okay.

17         THE COURT:  And then we will resume at 3:30 and make

18  a decision on Count 1 and on bail.

19         All right.

20         MR. PETERSON:  Very well, Your Honor.

21             (Recess)

22         THE COURT:  Well, I think I found the answer.

23         I assume Mr. Peterson has.

24         It appears to me that Ritalin is a Schedule 3 -- not

25  a Schedule 2 -- drug; which would mean the sentence,

1    instead of being 15, would be 5 years.

2         Is that what you have come up with, Mr. Peterson?

3         MR. PETERSON:  Well, Your Honor, I agree with the

4    court that the provisions of the Criminal Code, which I

5    have, would indicate that it is a Schedule 3 drug.

6         However, I have a witness from the DEA who is

7    familiar with Ritalin and is prepared to testify that it

8    has been classified a Schedule 2 drug substance.

9         It is somewhat unclear as to whether or not -- as of

10   this moment -- it is a Schedule 2 or Schedule 3; but at

11   least this witness would be able to confirm that it is

12   indeed a controlled substance and -- as far as the

13   information that she has -- that it is a Schedule 2

14   controlled drug substance.

15        THE COURT:  Well, I have looked at the most recent

16   section of the statute and --

17        MR. PETERSON:  Your Honor --

18        THE COURT:  -- under Schedule 3, Methylphenidate is

19   scheduled.  And that is the chemical name for Ritalin.

20   And the statute says it is Schedule 3.

21        And I don't see how I can even take testimony from

22   the agent, if it is going to be contrary to the statute.

23        MR. PETERSON:  I have no other information regarding

24   legislation that would contradict that, Your Honor --

25        THE COURT:  Although I do believe that -- we are not

1  dealing with an indictment here.

2      I would expect the government could move to amend the

3  Complaint as to Count 1.

4      MR. PETERSON:  Your Honor, I certainly would move to

5  amend the Complaint to conform to the information which

6  the Court has uncovered.

7      And, also, I would argue that that amendment perhaps

8  may not even be necessary at this stage, in light of the

9  fact that the Court is presented with a question of

10  whether or not there is probable cause to hold the

11  defendant -- and not to determine whether or not this case

12  should proceed to trial on the charges which are currently

13  listed in the criminal Complaint.

14      THE COURT:  All right.  Then you move to amend Count

15  1 to read a Schedule 3 controlled substance, instead of a

16  Schedule 2 controlled substance?

17      MR. PETERSON:  I do, Your Honor.

18      THE COURT:  That will be granted.

19      But I have another question now, as to Count 2 --

20  which I have already said the defendant would be bound

21  over for.

22      Has the deendant been convicted of any of these

23  offenses that allegedly occurred while he was on release?

24      Or is he just charged in Hennepin County and/or other

25  counties?

53

1          MR. PETERSON:  It is my understanding he is charged,

2     but not yet convicted.

3          THE COURT:  Okay.  Because I looked at Section 3147

4     of Title 18, which is the Count 2 charge, and that reads,

5     "a person convicted of an offense committed while released

6     pursuant to this chapter, shall be sentenced in addition

7     to the sentence described.

8          So it would appear to me that Count 2 is premature.

9          And I had not read that section before.

10          And I know that we routinely advise prisoners, before

11     they go out on bond, that if they commit a felony while

12     they are on release, they could be subject to a

13     consecutive separate sentence.

14          But it would appear that, in order for 3147 to apply,

15     a person would have to be convicted.

16          MR. PETERSON:  That is how I would read that statute

17     as well, Your Honor.

18          THE COURT:  And Count 2 itself reads  "committed an

19     offense."

20          It doesn't state "convicted of an offense."

21          But I suspect that that count cannot stand.

22          So what I am going to do -- I am going to dismiss

23     Count 2 because it charges an offense that has not

24     occurred.

25          I am going to bind over on Count 1, as amended,

1    alleging that the defendant possessed, with intent to

2    distribute, 800 dosage units of Ritalin, a Schedule 3

3    controlled substance -- hold on; we may have some new

4    information.

5              (The law clerk presents the Court with a paper

6              writing)

7         THE COURT:  All right, we can go back to the drawing

8    board.   21 CFR 1308.04 -- which is probably what the agent

9    was going to cite to us, if I had let her take the

10    stand -- lists changes in controlled substances.

11        And under Schedule 2 -- which is 21 USC 1308.12 -- it

12    lists Methylphenidate as a Schedule 2 controlled

13    substance.

14        So I suppose the thing to do now is to vacate the

15    amendment to Count 1; and Count 1 shall remain charging a

16    Scheduled 2 controlled substance.

17        And as to Count 1, I find that there is probable

18    cause to believe that the defendant, Terry Jon Martin, did

19    in fact possess 800 dosage units of Ritalin, a Schedule 2

20    controlled substance, in violation of the statute.

21        I will order that he be held for further action by

22    the United States Grand Jury on Count 1.

23        Yes, Mr. Peterson?

24        MR. PETERSON:  Your Honor, before we conclude the

25    hearing, perhaps I could raise another issue with regard

1    to Count 2.

2         THE COURT:  All right.

3         MR. PETERSON:  It is true that Section 3147 of Title

4    18 refers to a conviction.  But, at the same time, it

5    seems to this prosecutor that Section 3147 is intended to

6    be a sentencing enhancement provision; and it may well be

7    appropriate to charge that as part of the Count 1 offense

8    that is before the Court, so that the Court would have the

9    full sentencing authority that Congress had intended --

10   not only for the underlying offense charged in Count 1,

11   but also for the enhancement which would be allowed by way

12   of Title 18, Section 3147.

13        And so, until the United States would be allowed to

14   do some additional research on that question, I would like

15   the record to reflect that it would be our position that

16   that count should not be dismissed at this stage.

17        THE COURT:  It looks like Count 2 does not really

18   charge a crime.  It just gives the trial court an

19   enhancement sentence if -- at the time of conviction --

20   the defendant will in fact have been convicted of another

21   crime that occurred while he was on release.

22        Mr. O'Connor?

23        MR. O'CONNOR:  Well, Your Honor, to the extent that

24   it is alleged in this Complain that my client has violated

25   Section 3147 of 18 USC, I think we can all agree that

56

1    there is not probable cause to believe that a violation of

2    3147 has occurred.

3        If so, that count should be dismissed.

4        If it is a sentencing enhancement provision, it can

5    be raised somewhere down the line.

6        THE COURT: I agree, and at this point, even if it

7    were wordless and the defendant were charged, he couldn't

8    receive the enhanced sentence in any event because at this

9    stage he has not been convicted, so it is really

10   surplusage at this stage.

11       So I will dismiss Count 2, as I said I would; and if

12   the defendant is convicted on Count 1 and -- before

13   sentencing -- he is convicted on one of these other

14   offenses, then the sentencing enhancement provisions of

15   3147 will come into play.

16       MR. O'CONNOR: Your Honor, may I also be heard with

17   respect to what you have done on Count 1?

18       I would just like it to be clear that we are taking

19   the position that 21 USC Section 812, at the time --

20       THE COURT: That is 21 Code of Federal Regulations.

21       MR. O'CONNOR: Well, I understand, Your Honor, that

22   you have looked at the CFR to determine what Ritalin is --

23   whether it is a Schedule 2 or Schedule 3 drug -- and it is

24   our position that what is in the United States Code,

25   labeled as a Schedule 2 or 3 drug, is what controls; and

1    not the CFR.

2         So that to the extent that, at the time of the

3    commission of the offense, what was listed as a Schedule 2

4    drug -- or a Schedule 3 drug; excuse me -- in United

5    States Code, is what ought to control; and not the CFR.

6         THE COURT:  Well --

7         MR. O'CONNOR:  And for what it's worth, also, Your

8    Honor, I don't believe that there has been a showing here

9    that it is Ritalin.

10        They have just seen a drug; they compared it to a

11   picture.

12        THE COURT:  That is sufficient for probable cause.

13        He's a trained agent.

14        MR. O'CONNOR:  The last thing, Your Honor, is:

15        If there is some question about whether it is a

16   Schedule 2 or Schedule 3 drug, and if a Schedule 3 drug

17   carries a penalty of 5 years, that would eliminate any

18   presumption -- under 1342 of the Bail Reform Act of

19   1984 -- that would have to be overcome.

20        Which makes it a sticky issue.

21        I think the fact is, though, that the government had

22   the obligation to establish that no conditions or

23   combination of conditions, under Section 1342, would

24   insure his appearance and would make you reasonably sure

25   that the community and particular witnesses were not in

1    danger.

2         So I don't believe that they have made a showing, in

3    any event.

4         But with respect to your ruling, on whether it is a

5    Schedule 2 or Schedule 3 drug, that could adversely affect

6    our position, because of what may or may not be a

7    presumption.  If you were not going to detain anyway, then

8    that's moot; but if you were going to detain and determine

9    that we failed to overcome that presumption, thi issue

10   will come back to haunt us.

11        MR. PETERSON:  Your Honor, in defense of the Court's

12   ruling:  It is specifically provided in Title 21, Section

13   811, that there is authority for the attorney general to

14   reclassify or classify various controlled substances.

15        And I presume that it is by that statutory mandate

16   that the regulations were promulgated, and that it is

17   entirely proper for the Court -- and, indeed, required by

18   the Court -- to follow the schedule designated in the most

19   recent Code of Federal Regulations provision; rather than

20   simply what was originally mandated by Congress in the

21   list provided in Section 812 of Title 21.

22        THE COURT:  I agree with that, Mr. Peterson.

23        MR. O'CONNOR:  May I also, just for the record --

24   before you rule on our detention hearing -- I would like

25   to state that it is our position that, (a), the government

has not established by clear and convincing evidence that
its motion should be granted and that Mr. Martin should be
held without bail; (b), that the statute as applied, if
Mr. Martin is detained without bail, would be
unconstitutional under the Eighth Amendment as excessive
bail, and that the statute as applied to Mr. Martin would
violate his Fifth Amendment due process -- both
substantive and procedural -- due process rights, if he
were held without bail; and, finally, the fact that he has
always appeared at every hearing and that the United
States Government had an option in two cases to prevent
him from being out on bail and failed to do that -- and
likewise Hennepin County has done the same thing -- all
indicates that he's not going to flee the jurisdiction.

He does have employment periodically, can find
employment, is a carpenter.

He lives with his brother in Grand Rapids.

So all these conditions that are in Section C of
1342 -- that you can restrict where he can live, he can
put up a bail bond, there are ways to be reasonably
assured that he will not be a danger to persons or
society -- all of which have not been eliminated by
anything that Mr. Peterson has put on the stand.

He hasn't even addressed the issue of whether any of
these conditions of release can reasonably asure the

court.

So I believe that he hasn't made the showing in any event.

That's our position.

THE COURT:  Mr. Peterson?

MR. PETERSON:  The only thing I would add, Your Honor, is to confirm that it is the government's position that we are concerned, not only with the risk of flight, but also the danger to the community if Mr. Martin were released.

It is on those dual grounds that we would ask the court to detain this particular defendant.

THE COURT:  Well, the risk of flight is one thing, and I agree that it appears the defendant has made past court appearances.

Looking at his background, I think that there is a possibility of continuing violations, if he were to be released.

But I am going to set bail.  I am going to set bail in the amount of $10,000 cash or surety.

A condition of the bail will be that the defendant not use or possess any controlled substances or abuse alcohol while he is on release; that he not leave the District of Minnesota without prior approval of the court; and that he report in person to the Minneapolis office of

1    the probation office, every weekday morning before 9:00

2    o'clock a.m.

3       MR. O'CONNOR:  So you are assuming, Your Honor, that

4    he will not live in Grand Rapids?

5       THE COURT:  Well, the testimony indicated he was able

6    to find an apartment here and was living here at the time

7    of his arrest.

8       Is that correct, Mr. Peterson?

9       MR. PETERSON:  It is, Your Honor.

10      THE COURT:  All right.

11      It may very well be that there's not sufficient

12    reporting facilities to stay up in Grand Rapids, and it

13    appears he was living down here, anyway.

14      So I will do a bond order with those conditions.

15      And I should stress to you again, Mr. Martin, that

16    if -- while on release -- you fail to appear, you could

17    receive a separate sentence of 5 years in prison and a

18    $250,000 fine or both, just for failing to appear.  That

19    would be a consecutive sentence; which means you wouldn't

20    even start doing that time until after you have completed

21    whatever sentence you might get if you are convicted of

22    these charges.

23      You should know that, if you commit a felony while

24    you are on release -- which is one of the things which is

25    raised in this Complaint -- you could receive a separate

sentence of two to ten years in prison, and that would be
a consecutive sentence.

If you commit a misdemeanor while you are on release,
you could receive a separate sentence of 90 days to one
year in prison, and that would be a consecutive sentence.

If you attempt to intimidate any witnesses or jurors
or court officers while you are on release, you could
receive a separate sentence of five years in prison, or a
$5,000 fine, or both.

If you attempt to obstruct a criminal investigation
by bribing some person not to give information to an
investigator, you could receive a separate sentence of
five years in prison or a $5,000 fine, or both.

If you attempt to tamper with any witness or victim
or informant, you could receive a separate sentence of ten
years in prison, or a $250,000 fine, or both.

If you attempt to retaliate against any witness or
victim or informant, you could receive a separate sentence
of ten years in prison, or a $250,000 fine, or both.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right two other conditions of release
will be that you do not commit any felonies or
misdemeanors -- I'll make that you not even be arrested
for any felonies or misdemeanors; and if you are, or if

1   you violate any of those other conditions of release, the

2   bail will be forfeited , it will be vacated and forfeited,

3   and I'll order you be held without bond until the trial.

4       Do you understand that?

5       THE DEFENDANT:  Yes, YOur Honor.

6       THE COURT:  All right.

7       Anything further?

8       MR. PETERSON:  Nothing, Your Honor.

9       THE COURT:  All right, thank you.

10      MR. O'CONNOR:  Thank you.

11                  (Proceedings closed)

12                  CERTIFICATE

13  Certified a correct transcript of my notes taken in the

14  above entitled matter at the time and place hereinbefore

15  indicated.

16  Date:  July 1, 1987

17

18                  Ed Rafel

19                  U. S. District Court Reporter

20

21

22

23

24

25